IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MELISSA J. MANN,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        1:14CV1054
                                    )
WINSTON-SALEM STATE UNIVERSITY,     )
an Agent of the State of            )
North Carolina, and JANICE          )
SMITH, individually,                )
                                    )
            Defendants.             )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Presently before this court is a Motion for Summary Judgment and a Substitute Motion for Summary Judgment filed by Defendant Winston-Salem State University ("WSSU" or the "University") (Docs. 59, 91). Plaintiff Melissa J. Mann ("Mann") has responded, (Docs. 75, 97), and Defendant WSSU has replied, (Docs. 87, 100). Although Defendant Janice Smith ("Smith") filed a motion for summary judgment, (Doc. 57), following a settlement conference on March 24, 2017,[1] Plaintiff dismissed her claims against Smith, (Doc. 120), leaving only her claim against WSSU, (Doc. 35). That claim alleges Retaliation under Title VII. (Id.)

---

[1] Although the claims against Dr. Smith have been dismissed, analysis of the facts requires a description of those facts relating to Dr. Smith.

As such, WSSU's motion is ripe for the court's consideration. For the reasons herein, WSSU's motion will be granted.

## I.  <u>BACKGROUND</u>

WSSU hired Plaintiff, a Caucasian female, on August 16, 2010, as an "instructor" of Management within the Department of Management and Marketing. (Pl.'s Resp. to Def. Smith's Mot. for Summ. J., Ex. 1, Deposition of Melissa J. Mann ("Mann Dep.") (Doc. 75-1) at 60-61); Pl.'s Resp. to Def. WSSU's Mot. for Summ. J., Ex. 22, Affidavit of Melissa Mann ("Pl.'s Aff.") (Doc. 73-9) ¶¶ 3, 4.) Plaintiff became an "assistant professor" when the University was able to confirm the completion of her doctorate degree. (See Pl.'s Aff. (Doc. 73-9) ¶ 3.) Plaintiff alleges that "[i]mmediately upon being hired [she] began to suffer a pattern of discriminatory actions by Janice Smith." (Id. ¶ 5.) On May 5, 2015, Plaintiff resigned her position by letter to Dr. Moula Cherikh, who served as department chair at the time. (Doc. 94-17.)

Defendant Smith is African American and is a "tenured full professor [as well as] a member of the Reappointment and Tenure Committees for the Department of Management and Marketing" with the University. (Def. Smith's Answer (Doc. 39) ¶ 20.)

Plaintiff generally alleges that "[u]pon starting [her] employment at WSSU, it became immediately apparent to [her] that

- 2 -

[she] was not welcome as a professor in the [d]epartment due to the fact that [she] was white and not African-American." (Pl.'s Aff. (Doc. 73-9) ¶ 7.) Between 2010 and 2014, Plaintiff alleges a number of instances of Smith's purportedly race-fueled bullying and harassment including verbal confrontations, abusive emails to Plaintiff, gossip concerning Plaintiff spread to other WSSU employees and general attempts by Smith to hinder Plaintiff's career success at WSSU. (Id. ¶¶ 11-20, 24-51.) Plaintiff alleges that "nothing was done to discipline Dr. Smith or prevent her from continuing to harass me." (Id. ¶ 28.)

It is not disputed that hostilities existed between Dr. Smith and Plaintiff, although there is some dispute as to the degree to which these hostilities from Dr. Smith were based on race. The employees of WSSU contend that any hostility Plaintiff experienced was the result of "long-standing tensions and conflicts within the Department regarding the leadership of the Department, hiring practices, the curriculum, and the amount of autonomy afforded junior faculty members." (Def. WSSU's Substitute Mem. of Law in Supp. of Mot. for Summ. J. ("WSSU's Sub. Mem.") (Doc. 98) at 4-5[2] (citing Docs. 92-5 — 92-13;

_____

[2] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 3 -

Affidavit of Brenda Allen ("Allen Aff.") (Doc. 95-8) ¶¶ 8-9);
Affidavit of Moula Cherikh ("Cherikh Aff.") (Doc. 95-9) ¶ 11).)
For purposes of Defendant's motion for summary judgment, it
appears to this court, based upon evidence presented by
Plaintiff, that there is an issue of fact as to whether
Dr. Smith's actions toward Plaintiff were improperly motivated
by race. However, the claim against WSSU is one of retaliation,
and the relevance of this factual issue will be addressed
further in this opinion where necessary.

It also appears generally undisputed that during much of
Plaintiff's employment at WSSU, administration within the
Department of Management and Marketing ("the Department") had a
number of difficulties in terms of processes and procedures.
For example, Defendant acknowledges that review of Plaintiff for
promotion and tenure "was not in accordance with University
policy and resulted from confusion within the Department
regarding the University's tenure and promotion policies."
(WSSU's Sub. Mem. (Doc. 98) at 6 n.1 (citing Doc. 92-4; Allen
Aff. (Doc. 95-8) ¶ 16).) Defendant WSSU further acknowledges
that "[t]here was fundamental disagreement within the Department
regarding the strategic direction of the HR program and its
curriculum." (Id. at 5.) These administrative issues make it
difficult to determine who made various decisions about

- 4 -

Plaintiff's employment, including: what actions may be attributed to WSSU and what actions were the result of an individual conflict between two employees. While Plaintiff bears the burden of proving retaliation by Defendant, this court is required to resolve any material factual disputes in the light most favorable to Plaintiff.

Plaintiff alleges she was retaliated against by Defendant for filing two charges of racial discrimination. The first charge was filed with the University on August 27, 2013, when Plaintiff "submitted a formal complaint to [WSSU's Equal Employment Opportunity office] against Drs. Smith and [Mak] Khojasteh, alleging harassment, discrimination, and retaliation on the basis of race and color." (Affidavit of Silvia Ramos ("Ramos Aff.") (Doc. 95-4) ¶ 13 (citation omitted).) "After reviewing [all of] the materials and documents brought by Dr. Mann and interviewing the parties involved, [Silvia Ramos, WSSU's Chief Diversity Officer, Title IX Coordinator, and Equal Employment Opportunity and Affirmative Action Officer] was unable to determine whether the evidence supported Dr. Mann's allegations of harassment, retaliation, and racial discrimination." (Id. ¶ 18 (citations omitted).) Dr. Allen advised Plaintiff of these findings by letter dated November 1,

- 5 -

2013. (Doc. 93-17.) Dr. Suresh Gopalan, Dr. Moula Cherikh, and Ms. Ramos were copied on that letter. (Id.)

The second charge of discrimination was filed on May 15, 2014, when Plaintiff filed a "Notice of Charge of Discrimination" with the Equal Employment Opportunity Commission ["EEOC"] alleging "[she] was subjected to a racially hostile work environment and disparate treatment in regard to the terms and conditions of [her] employment as compared to other similarly situated employees not of [her] same race, which led [her] to file a complaint regarding the treatment with [her] employer." (Notice of Charge of Discrimination ("EEOC Charge") (Doc. 12-1) at 3.)

During the time period beginning August 27, 2013, the date of the filing of the charge with WSSU, administration at WSSU and in the Department specifically consisted of the following individuals. Dr. Brenda Allen was Provost and Vice Chancellor for Academic Affairs and had been since December 15, 2008. (Allen Aff. (Doc. 95-8) ¶ 2.) Dr. Moula Cherikh was Chair of the Department and had been since August 2013. (Cherikh Aff. (Doc. 95-9) ¶ 5.) Silvia Ramos was the "Chief Diversity Officer, Title IX Coordinator, and Equal Employment Opportunity and Affirmative Action Officer" at WSSU. (Ramos Aff. (Doc. 95-4) ¶ 2.) Dr. Derick Virgil was "Associate Dean over Academic Services and

- 6 -

Assessment" at WSSU. (Affidavit of Derick Virgil ("Virgil Aff.") (Doc. 95-10) ¶ 3.)

Plaintiff contends that four specific actions by WSSU constitute retaliation in violation of Title VII. Those retaliatory actions include Defendant Smith forcing "unfavorable class assignments on Plaintiff in the fall of 2014"; having "the Human Resources concentration cancelled in the summer of 2014"; being denied a pay raise; and having her students "punished by being denied access to school writing lab resources." (Pl.'s Substitute Br. in Resp. to WSSU's Mot. for Summ. J. ("Pl.'s Sub. Resp.") (Doc. 97) at 7-8.)

Additional relevant facts will be addressed in the analysis as necessary.

Plaintiff's sole claim as to WSSU is a Title VII "retaliation" claim brought against WSSU under 42 U.S.C. § 2000e-3(a). (Amended Complaint ("Am. Compl.") (Doc. 35) ¶¶ 82-92.) Plaintiff alleges that, "[b]y reason of the conduct of Defendant WSSU, Plaintiff has suffered emotional damage and injury and tremendous mental anguish and humiliation, and has lost the pay and benefits associated with the status of a tenured faculty member at WSSU." (Id. ¶ 88.) Plaintiff requests compensatory damages, punitive damages, reasonable attorney's fees and costs. (Id. ¶¶ 90-92.)

- 7 -

## II.  **LEGAL STANDARD**

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that no genuine issue of material facts exists, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of initially demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the moving party has met that burden, then the nonmoving party must persuade the court that a genuine issue remains for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). However, this requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts"; the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 586-87 (citations and footnote omitted) (quoting Fed. R. Civ. P. 56)(e)). In considering a motion for summary judgment, the court is not to weigh the evidence, but rather must determine whether there is a genuine dispute as to a material issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

- 8 -

Nonetheless, the court must ensure that the facts it considers can be "presented in a form that would be admissible in evidence" and that any affidavits or evidence used to support or oppose a motion are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." See Fed. R. Civ. P. 56(c)(2), (4).

The court must view the facts in the light most favorable to the nonmoving party, drawing inferences favorable to that party if such inferences are reasonable. Anderson, 477 U.S. at 255. However, there must be more than a factual dispute, the fact in question must be material, and the dispute must be genuine. Id. at 248; Fed. R. Civ. P. 56(c). A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

## III. DISCUSSION – WSSU'S MOTION FOR SUMMARY JUDGMENT

"To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove (1) that she engaged in a protected activity, as well as (2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir.

- 9 -

2015) (quoting E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005) (internal quotation marks omitted).

> "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." University of Tx. Sw. Med. Ctr. v. Nassar, ____ U.S. ____, 133 S. Ct. 2517, 2528 (2013) (emphasis added); see Foster v. University of Maryland-Eastern Shore, 787 F.3d 243, 246, 252 (4th Cir. 2015) ("Nassar . . . held that a successful retaliation plaintiff must prove that retaliatory animus was a but-for cause of the challenged adverse employment action."). Because Title VII prohibits discrimination only when it results from particular, enumerated motivations, "when an employer articulates a reason for discharging the plaintiff" that the statute does not proscribe, "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks omitted); see also id. (explaining that it is not our role to sit "as a kind of super-personnel department weighing the prudence of employment decisions") (internal quotation marks omitted).

Villa v. Cavamezze Grill, LLC, 858 F.3d 896, 900-01 (4th Cir. 2017).

The parties do not dispute whether Plaintiff engaged in protected activity. The protected activity was Plaintiff submitting a formal complaint to WSSU's EEO office on August 27, 2013, as well as filing an actual charge with the EEOC on May 15, 2014. (Ramos Aff. (Doc. 95-4) ¶¶ 13, 22); (EEOC Charge (Doc. 12-1) at 3.)

- 10 -

WSSU argues summary judgment should be granted because "(1) Plaintiff failed to exhaust her administrative remedies regarding [the retaliation] claim; (2) she failed to establish a prima facie case of retaliation; and (3) the University had legitimate, non-retaliatory reasons for its actions." (WSSU's Sub. Mem. (Doc. 98) at 15.)

Plaintiff responds that "all of the four complained of retaliatory acts by Defendant WSSU against Plaintiff are reasonably related to the original complaint and/or were developed by the reasonable investigation of the claim itself," which would not require Plaintiff "to file a separate charge of retaliation after the first for fear of further retaliation." (Pl.'s Sub. Resp. (Doc. 97) at 9 (citing Jones v. Calvert Group, Ltd., 551 F.3d 297, 302 (4th Cir. 2009)). Plaintiff also argues that "she has met her burden of showing direct evidence of retaliatory animus through the prolonged and systematic actions of Dr. Smith, which she complained about to Defendant WSSU and the EEOC, and for which she was retaliated against by Defendant WSSU through meaningful negative employment consequences." (Id. at 12.) Plaintiff argues that "[i]n the alternative, Plaintiff is still able to meet the McDonnell Douglas shifting burden standard, specifically, there are legitimate issues of fact that need to be determined by a jury as to whether Defendant WSSU's

- 11 -

actions were for a legitimate business purpose or pretextual."
(Id.) Finally, Plaintiff argues that "[t]he University's
asserted non-retaliatory reasons for its actions are mere
pretext for discrimination." (Id. at 22.)

In its reply, in addition to disputing the above arguments,
WSSU highlights that "[i]n her Response, Plaintiff, for the very
first time, adds a fourth distinct act: 'that WSSU removed her
as head of the human resources concentration and . . . allowed
Dr. Smith to set an unfavorable schedule for her in the fall of
2014.'" (Def. WSSU's Substitute Reply in Supp. of Mot. for Summ.
J. ("WSSU's Sub. Reply") (Doc. 100) at 3.) WSSU also argues that
"WSSU cannot be held liable for any alleged retaliatory acts
committed by Smith" because "Plaintiff has failed to demonstrate
a basis for attributing Smith's alleged misconduct to WSSU."
(Id. at 3-4.)

A.    **Failure to Exhaust Administrative Remedies**

Defendant initially argues that Plaintiff failed to exhaust
administrative remedies with the EEOC as to the retaliation in
response to filing an EEOC complaint. (WSSU's Sub. Mem. (Doc.
98) at 15-17.) The parties' dispute is directed only to the
question of whether the alleged retaliation should have been
submitted to the EEOC in a separate complaint. (See id. at
16-17.)

- 12 -

"[A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim." Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009). However, a plaintiff alleging a claim for retaliation does not have to provide a separate right-to-sue letter. See id. at 301-02 (holding that plaintiffs are allowed to raise retaliation claims for the first time in federal court, without previously exhausting administrative remedies). Nevertheless, a plaintiff's complaint must still contain sufficient allegations to state a claim for retaliation. See Davis v. N.C. Dep't of Corr., 48 F.3d 134, 140 (4th Cir. 1995) (holding "that receipt of, or at least entitlement to, a right-to-sue letter [from the EEOC] is a jurisdictional prerequisite that must be alleged in a plaintiff's complaint").

The EEOC complaint has been filed with this court. (EEOC Charge (Doc. 12-1).) The Amended Complaint sets forth a retaliation claim in violation of 42 U.S.C. § 2000e-3(a) as to those actions occurring after the filing of the May 2014 EEOC complaint. (Am. Compl. (Doc. 35) ¶¶ 82-92.) The EEOC complaint alleges discrimination and retaliation by WSSU in response to reporting and opposing discrimination, (see EEOC Charge (Doc. 12-1) at 3), but does not include a description of any alleged

- 13 -

retaliation following the EEOC complaint. This court finds the alleged retaliation in response to an EEOC complaint as set forth in the Amended Complaint does not require another EEOC filing. See Calvert, 551 F.3d at 301-02. In light of the record presented to this court, Defendant's motion for summary judgment for failing to exhaust administrative remedies will be denied.

**B.    Direct Evidence of Retaliatory Animus**

"A plaintiff may prove discrimination under Title VII, 42 U.S.C. § 1981, or the ADEA either through direct and indirect evidence of [discriminatory] animus, or through the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 [93 S. Ct. 1817, 36 L.Ed.2d 668] (1973)." Jones v. Constellation Energy Projects & Servs. Grp., Inc., 629 F. App'x 466, 468 (4th Cir. 2015) (quoting Foster, 787 F.3d at 249) (internal quotation marks omitted); Castonguay v. Long Term Care Mgmt. Servs., LLC, No. 1:11CV682, 2014 WL 1757308, at *5 (M.D.N.C. Apr. 30, 2014).

Plaintiff argues that "she has met her burden of showing direct evidence of retaliatory animus." (Pl.'s Sub. Resp. (Doc. 97) at 12.) First, Plaintiff argues that "[t]he evidence, viewed in a light most favorable to Plaintiff, reveals that Dr. Smith, from nearly Plaintiff's first day of work, intended to cause great and permanent harm to Plaintiff's vocational status at

- 14 -

WSSU because of Plaintiff's race." (Id. at 13.) Plaintiff

alleges that, after Smith found out about Plaintiff's internal

EEOC complaint, and

> [o]nce Dr. Smith had [control over Plaintiff's class
> schedule in the Spring and Fall of 2014], she reset
> Plaintiff's teaching schedule, refusing to honor
> Plaintiff's requested dates for classes, adding
> additional new "preps" for new classes, and increasing
> Plaintiff's teaching load despite knowing that this
> was the year before Plaintiff came up for tenure and
> Plaintiff needed to research and "publish or perish."

(Id. at 15-16 (citing Mann Dep. (Doc. 75-1) at 266-69).)

Plaintiff's other "direct evidence" is the timing of WSSU's

cancellation of the Human Resources concentration and the

fact that various staff members of WSSU attributed the

cancellation, at least in part, to Plaintiff's inability to

get along with Smith. (See id.) WSSU replies that "Smith

did not have control over Plaintiff's class schedule."

(WSSU's Sub. Reply (Doc. 100) at 6.)

"Direct evidence encompasses 'conduct or statements'

that both (1) 'reflect directly the alleged discriminatory

attitude,' and (2) 'bear directly on the contested employment

decision.'" Laing v. Fed. Exp. Corp., 703 F.3d 713, 717 (4th

Cir. 2013) (quoting Warch v. Ohio Cas. Ins. Co., 435 F.3d 510,

520 (4th Cir. 2006)). "Evidence is too speculative if the

factfinder cannot rationally choose between mere 'possibilities'

of meanings." Johnson v. Toys "R" US-Delaware, Inc., 95 F. App'x

1, 7 (4th Cir. 2004) (citing <u>DeJarnette</u>, 133 F.3d at 298; <u>Abady</u> <u>v. Hanover Fire Ins. Co.</u>, 266 F.2d 362, 364 (4th Cir. 1959)). "Direct evidence is evidence from which no inference is required, such as a decisionmaker's statement that she retaliated because of the plaintiff's gender." <u>Castonguay</u>, 2014 WL 1757308, at *5 (citing <u>Holley v. N.C. Dep't of Admin.</u>, 846 F. Supp. 2d 416, 427 (E.D.N.C. 2012)).

This court disagrees with Plaintiff and finds that Plaintiff has not presented direct evidence of retaliation by WSSU. While Plaintiff's evidence as to Dr. Smith's discriminatory comments and actions may be sufficient to create a material issue of fact as to Dr. Smith's improper racial animus, there is no direct evidence that the decisionmakers of Plaintiff's schedule were motivated by a retaliatory animus. In terms of cancellation of the Human Resources concentration, Plaintiff's direct evidence is insufficient to establish a but-for causal connection as required by <u>Nassar</u>, 133 S. Ct. at 2528.

While Dr. Smith may have played a role in Plaintiff's employment circumstances, Plaintiff has not presented evidence sufficient to establish that Smith was the decisionmaker with respect to the modification of Plaintiff's curriculum and schedule. The Fourth Circuit has held that "the person allegedly

- 16 -

acting pursuant to discriminatory animus need not be the 'formal decisionmaker' to impose liability upon an employer for an adverse employment action, so long as the plaintiff presents sufficient evidence to establish that the subordinate was the one 'principally responsible' for, or the 'actual decisionmaker' behind, the action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 288-289 (4th Cir. 2004) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151-52, 120 S. Ct. 2097, 2111 (2000)).

The Fourth Circuit further explained the agency issue as it relates to retaliation in Balas v. Huntington Ingalls Industries, Inc.:

> Title VII does not "limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 290 (4th Cir. 2004). However, [the Fourth Circuit has] refused to endorse a construction of Title VII that would treat a "subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision [as] a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision." Id. at 291. For Balas's retaliatory termination claim to succeed, she must demonstrate that Price "possessed such authority as to be viewed as the one principally responsible for the decision." Id. It is fatal to her claim that she presents no evidence to that effect.

711 F.3d 401, 410-11 (4th Cir. 2013). Similarly, here, Plaintiff has failed to present evidence that Smith was sufficiently

- 17 -

responsible for Plaintiff's circumstances evidencing retaliation such that Smith's animus constitutes direct evidence of retaliation by WSSU. With respect to the schedule change, it is at most speculative that Smith had final authority over Plaintiff's schedule and curriculum. While Plaintiff testified that Smith controlled schedules for the fall of 2014, (Pl.'s Sub. Resp. (Doc. 97) at 4 (citing Mann Dep. (Doc. 75-1) at 266-69)), Plaintiff offers no specific support for that position. This court finds Plaintiff's general allegation is insufficient to create a material issue of fact that Smith had sufficient control over Plaintiff's schedule such that any change that might have occurred may be attributed to retaliatory animus by Smith in light of the undisputed evidence.

The evidence in this case appears undisputed that on August 19, 2013, Dr. Cherikh, as Chair of the Department, sent an email naming area coordinators for 2013-2014. (Doc. 77 at 29.) Dr. Cherikh made Smith the Human Resources ("HR") Management Coordinator. (Id.) The email stated that the "coordinators will work with the chair and their colleagues . . . . Their duties will consist of program coordination and management (i.e., course offerings . . . scheduling, outcome assessments, etc.) and curriculum development. Any curriculum development will have to be

- 18 -

evaluated by the whole department and will follow the University established process." (Id.) This email confirms Plaintiff's testimony that Smith acquired control over Plaintiff's schedule to some degree.

On August 27, 2013, Plaintiff filed her EEO complaint with Ramos. (Pl.'s Sub. Resp. (Doc. 97) at 3.) From August 20, 2013 through September, 2013, there is evidence of Dr. Smith taking steps to control the HR curriculum and scheduling as the HR coordinator. (See (Doc. 77) at 29-32.) Also during September, Ramos advised Smith of Plaintiff's complaint, (Doc. 93-9), and sought responses to the allegations. (Doc. 80 at 26-30.)

However, by the end of September, Smith's control over Plaintiff's schedule diminished to the point Smith was unable to take any action on Plaintiff's schedule for Spring 2014. On September 26, 2013, Dr. Allen, for a second time, directed Smith to recuse from any deliberations about Plaintiff's employment. (Doc. 93-13 at 1.) On October 4, 2013, Smith emailed Dr. Cherikh to advise of, and apparently modify, the Spring 2014 schedule. (Doc. 94-3.) The record contains an email from Cherikh dated October 4 explicitly responding to Smith that "[t]he timing and meeting days for Dr. Mann's HR classes for spring 2014 cannot be changed at this point. The schedule stands as it is." (Id. at 1.) In the Spring of 2014, Dr. Cherikh discontinued the role of

- 19 -

area coordinators because "nothing positive was reached . . . but only complaints and counter complaints between Dr. Smith and Dr. Mann." (Cherikh Aff. (Doc. 95-9) ¶ 13 (citations omitted).) Plaintiff has presented no evidence as to any schedule preparation for the Fall of 2014, the parties responsible for the creation of that schedule, or any difficulties created by that schedule. In light of the fact Dr. Cherikh discontinued Smith's role of area coordinator, there is no evidence Smith controlled Plaintiff's schedule for the Fall 2014.

Due to Dr. Cherikh's rejection of Smith's requested schedule for the Spring 2014 semester and the discontinuance of Smith as HR Coordinator, Plaintiff's testimony is not sufficient to create a material issue of fact as to Smith's actual control of Plaintiff's schedule. To the contrary, while Smith and Plaintiff may have believed that as area coordinator, Smith had some control of scheduling, the record contains no evidence that any changes suggested by Smith were allowed by Defendant; instead, the only specific evidence of Smith's effort to make schedule changes requires a finding that Smith's proposal was rejected by Cherikh and Defendant. (Doc. 93-13; Doc. 94-3.)

Plaintiff also argues "direct evidence" of WSSU's retaliation in that "[d]efendant WSSU engaged in conduct and statements that clearly reflected the retaliatory motive in

- 20 -

cancelling Plaintiff's Human Resources concentration." (Pl.'s Sub. Resp. (Doc. 97) at 16.) Like the claim with respect to class scheduling, there is no evidence that Dr. Smith had sufficient control over the decision such that her discriminatory animus might be deemed direct evidence of WSSU's retaliation. To the contrary, the decision appears to have been made by others and to have affected both Plaintiff and Smith. (E.g., Cherikh Aff. (Doc. 95-9) ¶ 20.) Although the evidence permits a finding that Allen and Gopalan considered, among other factors, that Smith and Plaintiff could not get along, (Doc. 78 at 504), the evidence does not rise to the level of direct evidence of retaliatory animus sufficient to establish a "but-for" causal relationship.

Nevertheless, Plaintiff contends that, even if the direct evidence fails to establish a genuine issue of fact, she has presented sufficient evidence to proceed "through the burden-shifting framework of McDonnell Douglas." Constellation Energy Projects, 629 F. App'x at 468.

C.    **Prima Facie Case of Retaliation**

1.    **Summary of Relevant Law**

"To state a prima facie case of retaliation, [Plaintiff] must show (1) that [s]he engaged in a protected activity; (2) [WSSU] acted adversely against [her]; and (3) the protected

- 21 -

activity was causally connected to the adverse action." <u>Holland</u> <u>v. Wash. Homes, Inc.</u>, 487 F.3d 208, 218 (4th Cir. 2007) (citing <u>Beall v. Abbott Labs.</u>, 130 F.3d 614, 619 (4th Cir. 1997)).

"In retaliation cases, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Jensen-Graf v. Chesapeake Employers'</u> <u>Ins. Co.</u>, 616 F. App'x 596, 598 (4th Cir. 2015) (quoting <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006) (internal quotation marks omitted)). Further, "[s]uch actions need not affect the terms and conditions of employment." <u>Id.</u> However, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." <u>Burlington N.</u>, 548 U.S. at 68. "Although the fact that an employee continues to be undeterred in his or her pursuit of a remedy may shed light as to whether the actions are sufficiently material and adverse to be actionable, the court ultimately must apply an objective standard." <u>Wells v.</u> <u>Gates</u>, 336 F. App'x 378, 384 (4th Cir. 2009) (quoting <u>Somoza v.</u> <u>Univ. of Denver</u>, 513 F.3d 1206, 1214 (10th Cir. 2008) (internal quotation marks omitted)).

Finally, "in determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (internal citations omitted); see also McNeill v. Bd. of Governors of the Univ. of N.C., 837 F. Supp. 2d 540, 547 (M.D.N.C. 2011). "However, this does not mean that all the actions alleged to be retaliatory must necessarily be considered together, but if context suggests that the actions are related, they may be considered together." Buckner v. Lew, No. 5:13-CV-199-FL, 2015 WL 5725760, at *10 (E.D.N.C. Sept. 30, 2015), reconsideration denied, No. 5:13-CV-199-FL, 2015 WL 6692234 (E.D.N.C. Nov. 2, 2015), and aff'd, 668 F. App'x 487 (4th Cir. 2016).

Assuming arguendo that Plaintiff "has established a prima facie case of retaliation, [then] the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action." Navy Fed. Credit Union, 424 F.3d at 407 (citing Reeves, 530 U.S. at 143; Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998)). "Assuming the employer meets this burden of production, . . . the burden shifts back to the plaintiff to prove by a preponderance of the

- 23 -

evidence that the employer's stated reasons for taking the employment action were not its true reasons, but rather pretext for unlawful discrimination." Moore v. Mukasey, 305 F. App'x 111, 114-15 (4th Cir. 2008) (quoting Hill, 354 F.3d at 285 (internal quotation marks omitted)). "A plaintiff may satisfy this burden by showing either that the employer's explanation is not credible, or that the employer's decision was more likely the result of retaliation." Sharif v. United Airlines, Inc., 841 F.3d 199, 203 (4th Cir. 2016) (citing Reeves, 530 U.S. at 143; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

"Title VII retaliation claims must be proved according to traditional principles of but-for causation, which requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Everhart v. Bd. of Educ. of Prince George's Cty., 660 F. App'x 228, 230 (4th Cir. 2016) (quoting Nassar, 133 S. Ct. at 2533) (internal quotation marks omitted); Castonguay, 2014 WL 1757308, at *7. In addition, "[a] plaintiff cannot prove causation, the third element of the prima facie case, without showing that the employer actually had knowledge of the protected activity." Pittman v. Hunt Const. Grp., 564 F. Supp. 2d 531, 535 (E.D.N.C. 2008), aff'd, 308 F. App'x 672 (4th Cir.

2009) (citing Gibson v. Old Town Trolley Tours of Wash., D.C. Inc., 160 F.3d 177, 181-82 (4th Cir. 1998); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)); Adefila v. Select Specialty Hosp., 28 F. Supp. 3d 517, 524 (M.D.N.C. 2014) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001)). "To establish a causal link between the alleged animus and the adverse employment action, a plaintiff must demonstrate that the individuals who expressed animus played a role in the adverse employment action." Constellation Energy Projects, 629 F. App'x at 470 (citing Crockett v. Mission Hosp., Inc., 717 F.3d 348, 356 (4th Cir. 2013)).

   With regards to two of the alleged adverse employment actions, Plaintiff argues that temporal proximity between her protected action and the alleged retaliation is probative. (Pl.'s Sub. Resp. (Doc. 97) at 19-20.)

   The Fourth Circuit has held that certain periods of time between the protected activity and the allegedly retaliatory "adverse employment action" can have an impact on causation. See Foster, 787 F.3d at 253 (one-month period is "sufficient to create a jury question regarding the causation prong of the prima facie case"); Pascual v. Lowe's Home Ctrs., Inc., 193 F. App'x 229, 233 (4th Cir. 2006) (A three- to four-month period

- 25 -

"is too long to establish a causal connection by temporal proximity alone."); King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (A two- and a half-month period "between Carlson's notice of the complaint and the adverse employment action is sufficiently long so as to weaken significantly the inference of causation between the two events."). "[G]enerally speaking, however, the passage of time alone cannot provide proof of causation unless the temporal proximity between an employer's knowledge of protected activity and an adverse employment action was very close." Pascual, 193 F. App'x at 233 (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curium) (internal quotation marks omitted)).

Here, the parties do not dispute whether Plaintiff engaged in protected activity. The parties do dispute whether Plaintiff has presented evidence of adverse employment action and whether there is a causal connection between the protected activity and any adverse employment action. (WSSU's Sub. Mem. (Doc. 98); Pl.'s Sub. Resp. (Doc. 97).)

Plaintiff alleges four adverse employment actions: "(1) the resetting of [her] teaching load by Smith; (2) the denial of merit bonus; (3) the placement of the HR program on hold; and (4) the denial of her class access to the writing lab on November 13, 2014." (WSSU's Sub. Reply (Doc. 100) at 8; Pl.'s

- 26 -

Sub. Resp. (Doc. 97) at 7-8.) As to the second adverse employment action, the parties agree that Plaintiff being "passed over" for the merit raise constitutes an adverse employment action.

### 2.  <u>Writing Lab Incident</u>

This court finds that Plaintiff's class being turned away from the Writing Lab on November 13, 2014, does not rise to the level of an "adverse employment action" sufficient to support a retaliation claim. This court also finds that Defendants showed a "legitimate, non-retaliatory reason" for sending Plaintiff's class away that day.

#### (a)  <u>Facts</u>

The Writing Center incident occurred when several of Plaintiff's students sought assistance with an assignment at the Writing Center. All of the students were turned away on that day, including at least one or two students who had made an appointment. Plaintiff states that she was

> retaliated against again on November 13, 2014 when I
> received emails from several of my students that
> informed me that they were denied access to the
> writing lab because I was being "punished" for not
> making an appointment[] (though many of them did.)

(Pl.'s Aff. (Doc. 73-9) ¶ 56.) Plaintiff further describes in her deposition her awareness of the emails sent by the Writing Center to her students saying the Writing Center was not "going

- 27 -

to see any of Dr. Mann's students." (Mann Dep. (Doc. 75-1) at 227-28.)

The record contains three different student emails detailing the exchange at the Writing Center. (Doc. 80-3 at 5, 7, 11.) The first email provides that the Writing Center "informed [the student] that this is a punishment because they were not made aware that Dr Mann's [sic] students would be coming." (Id. at 5.) The second email provides that "[w]hen [the student] went to check in at the front desk, the two women told [her that she] was not allowed to be seen today because [she] was in [Plaintiff's] class, and they did not know [Plaintiff's] students were coming." (Id. at 7.) The third email provides that "[the student's] appointments were cancelled and they are saying it's due to [Plaintiff] not telling them that [the students] were coming." (Id. at 11.)

Plaintiff sent an email to Dr. Notis Pagiavlas and Dr. Cherikh complaining of the incident, alleging that her students were "discriminated against" by the actions of Dr. Pamela Simmons. (Doc. 80-3 at 3.) The email also references one of the issues Dr. Simmons raised ("[e]ven if Dr. Simmons was short-staffed"). (See id.) In the email, Plaintiff describes her apparent resolution of the issue with Dr. Virgil's support. (Id.) Plaintiff sent an email to her students advising them of

- 28 -

the problem's resolution and the record contains no evidence of further issues between Plaintiff and the Writing Center. (See id. at 1-2.)

Dr. Simmons' affidavit, while consistent with Plaintiff's allegations in many respects, states that twenty-five or more of Plaintiff's students arrived at the Writing Center seeking assistance on the day in question. (Affidavit of Pamela Simmons ("Simmons Aff.") (Doc. 95-5) ¶ 5.) According to Dr. Simmons, Plaintiff directed the students to visit the Writing Center during their regularly scheduled class time and the Writing Center did not service Plaintiff's students due to limited space, limited seats, and limited faculty. (Id. ¶¶ 5, 9.) Dr. Simmons describes Writing Center policy as follows:

> The Writing Center policy offers guidelines for faculty and students. The policy provides that faculty are expected to assist the Writing Center in assisting students by meeting with the Writing Center staff first before sending large groups of students to the Center. Faculty are also expected to provide the Writing Center staff with prior knowledge of writing assignments so that the tutoring staff can best help students sent over by faculty.

> Pursuant to the Writing Center's policy, before asking students to visit the Center, faculty are to meet with one of the Writing Centers' staff to explain the assignment and discuss the desired interventions they would like the staff to provide. Faculty are also expected to meet with the Writing Center staff after the assignment has been completed so that the staff can determine whether the intervention was effective.

- 29 -

(Id. ¶¶ 11-12.) Dr. Simmons concludes that "Dr. Mann did not follow the Writing Center's guidelines." (Id. ¶ 13.)

Dr. Virgil describes the November 2014 Writing Center incident consistently with Dr. Simmons, including the policies described by Dr. Simmons and the problems that arose from an entire class arriving at the same time without prior notice to the Writing Center. (Virgil Aff. (Doc. 95-10) at 2-3.)

Plaintiff only disputes the facts described by Dr. Simmons and Dr. Virgil in a general, conclusory fashion. Plaintiff alleges that she was told she "had to follow certain protocols that were not put in place for everyone else. . . . They weren't actual protocols. They were never communicated to me . . . That's not what any of the other, you know, faculty do." (Mann Dep. (Doc. 75-1) at 230-31.) While there may be some dispute as to the actual rules of the Writing Center, Plaintiff's testimony does not contradict the following operative facts as described by Dr. Simmons and Dr. Virgil: (1) a large number of students showed up unexpectedly to the Writing Center on November 13, 2014; (2) the Writing Center did not have the teachers or facilities to accommodate the group of students at that time; and (3) whether Plaintiff was aware of it or not, both Dr. Virgil and Dr. Simmons had some expectation that teachers would

notify the Writing Center when students would be seeking assistance on a particular project.

**(b)   Adverse Employment Action**

Plaintiff alleges that the Writing Center incident "caused [her] to risk losing the respect of her students and increased the likelihood that Plaintiff would have negative reviews from students." (Pl.'s Sub. Resp. (Doc. 97) at 18-19.) However, "[c]ourts within the Fourth Circuit have generally found that actions which essentially amount to criticism of an employee such as negative performance evaluations, reprimands or warnings, and counseling are alone insufficient to constitute materially adverse employment actions under the Burlington standard." Phillips v. City of Concord, No. 1:10CV947, 2013 WL 1934869, at *9 (M.D.N.C. May 9, 2013), report and recommendation adopted, No. 1:10CV947, 2013 WL 2403469 (M.D.N.C. May 31, 2013) (citing Christy v. City of Myrtle Beach, No. 4:09-cv-1428-JMC-TER, 2011 WL 4808193, at *21 (D.S.C. July 27, 2011)). Further, Plaintiff has not cited, nor has this court found, any case law holding that this type of action constitutes an "adverse employment action" as necessary to establish adverse employment action in support of a Title VII Retaliation claim. It appears a third party, the students, were those most affected by this action and any adverse effect on Plaintiff was collateral and

- 31 -

tenuous at most. Plaintiff has not presented evidence of any adverse consequences to Plaintiff from the Writing Center incident other than her concern over her reputation with her students.

Any prospective negative impact of this incident, to the extent it exists, is further limited by the fact that "[o]nce the issues were resolved, Dr. Mann invited [Simmons] to facilitate a session on best practices in writing in two of her classes" and Simmons "invited Dr. Mann's students to visit the Writing Center." (Simmons Aff. (Doc. 95-5) ¶ 15.) Plaintiff's email to her students, indicating "[t]he writing center will now be making appointments to see you and will provide you the highest level of service possible . . . . Everyone is taking this situation seriously and we can assure you that you will not have this issue going forward" further suggest the negative impact of the incident was limited and corrected. (Doc. 80-3 at 1-2.)

The Writing Center incident occurred almost six months after Plaintiff filed the EEOC complaint and did not prevent Plaintiff from further interacting positively and collaboratively with the staff of the Writing Center. This incident does not appear sufficiently adverse to "have dissuaded [Plaintiff] from making or supporting a charge of

- 32 -

discrimination." <u>Jensen-Graf</u>, 616 F. App'x at 598 (quoting <u>Burlington N.</u>, 548 U.S. at 68).

For these reasons, this court finds that Plaintiff's students, being "turned away" from the Writing Center on November 13, 2014, does not constitute an adverse employment action sufficient to support a retaliation claim.

### (c) **Legitimate, Non-Retaliatory Reasons**

The record indicates that on November 13, 2014, Plaintiff's students were turned away from the Writing Center because Dr. Mann did not make an appointment. (<u>See</u> Simmons Aff. (Doc. 95-5) ¶¶ 5-8; Virgil Aff. (Doc. 95-10) ¶ 7.) The record also indicates that neither Writing Center employee was aware of Plaintiff's protected activity. (<u>Id.</u> ¶ 17.)

WSSU argues "Plaintiff's class was denied access to the writing center because Plaintiff did not follow the writing center's guidelines and let the center know ahead of time that her entire class would be coming." (WSSU's Sub. Mem. (Doc. 98) at 27.) Plaintiff argues that "writing lab students who were turned away had appointments and were specifically told that

- 33 -

being turned away was 'a punishment'[3] for the Plaintiff despite having prior appointments." (Pl.'s Sub. Resp. (Doc. 97) at 24.) As highlighted above, however, Smith and Virgil both claim, with no knowledge of Plaintiff's protected activity, that Plaintiff's students were turned away because Plaintiff did not make an appointment to send her entire class at one time. (See Simmons Aff. ¶¶ 5-8; Virgil Aff. (Doc. 95-10) ¶ 7.)

This court finds that WSSU has "articulate[d] a legitimate, non-retaliatory reason for the adverse employment action." Navy Fed. Credit Union, 424 F.3d at 407 (citing Reeves, 530 U.S. at 143; Laughlin, 149 F.3d at 258). The Writing Center was unable to accommodate Plaintiff's entire class without notice, (see Simmons Aff. (Doc. 95-5); Virgil Aff. (Doc. 95-10), and Plaintiff has not produced evidence sufficient to show otherwise.

Plaintiff argues that "[p]retext can also be shown where two similarly situated employees engage in substantially similar conduct, yet are disciplined differently. . . . The fact that Plaintiff's students alone were subject to additional

_____

[3] Although one email does refer to a "punishment," because Drs. Simmons and Virgil were not aware of Plaintiff's protected activity, the only reasonable inference of a "punishment" is to the failure to provide advance notice of the attendance of an entire class at the Writing Center as stated in the email, consistent with the email reference to the failure to give notice. (See Doc. 80-3 at 5.)

- 34 -

rules . . . is sufficient evidence . . . that the Defendant's stated reasons were mere pretext for discrimination." (Pl.'s Sub. Resp. (Doc. 97) at 24-25 (internal citations omitted).) However, Plaintiff identifies only one comparator, Dr. Monica (Dee) Guillory, another junior faculty member. (See Mann Dep. (Doc. 75-1) at 231.) Dr. Guillory's experiences with the Writing Center, as described by Plaintiff, are too vague to permit a comparison sufficient to create a material issue of fact. It is not clear how many students Dr. Guillory may have sent to the Writing Center at any particular time or what Dr. Guillory may have done in relation to the Writing Center protocols. (See id. at 231-32.) Therefore, it is speculative as to whether Dr. Guillory is a comparator that would be sufficiently similar to create an inference of discrimination or retaliation.

As further evidence of pretext, Plaintiff cites a portion of her own deposition where she claims the Writing Center's policy or protocol that professors make a reservation before sending their entire class was "made up" and "were not put in place for everyone else." (Id. at 230.) The record otherwise offers no corroboration for this claim in the face of Simmons and Virgil's contrary testimony. Even if Plaintiff's claims are true, Simmons and Virgil both stated that, at the time of their allegedly retaliatory interaction with Plaintiff, they "had no

- 35 -

knowledge that Plaintiff had filed complaints against Dr. Janice Smith and Dr. Mak Khojasteh with the University's EEO Officer and a civil rights complaint against the University." (Simmons Aff. (Doc. 95-5) ¶ 17; Virgil Aff. (Doc. 95-10) ¶ 17.) Plaintiff has not presented evidence from which a jury could find that Simmons or Virgil did know of the complaints. As such, this court finds that Plaintiff did not "establish that [Simmons and Virgil] had knowledge of the protected activity in order for [their] subsequent adverse employment actions to be retaliatory." Shields v. Fed. Exp. Corp., 120 F. App'x 956, 962 (4th Cir. 2005) (citing Luckie v. Ameritech Corp., 389 F.3d 708, 715 (7th Cir. 2004)).

This court finds that Plaintiff has not shown that the writing lab incident constitutes a retaliatory act. The incident was not materially adverse, the decisionmakers were not aware of the discrimination complaint, and Plaintiff has not presented material evidence from which a jury could find that WSSU's "stated reasons for taking the employment action were not its true reasons, but rather 'pretext' for unlawful discrimination." Moore, 305 F. App'x at 114–15 (citing Hill, 354 F.3d at 285). The Writing Center incident constitutes an unfortunate episode for Plaintiff and for her students, but the evidence is

- 36 -

insufficient to establish it as an adverse employment action for purposes of a retaliation claim.

### 3.  Schedule Change

This court finds that the record does not support Plaintiff's allegations regarding Smith's tampering with her teaching schedule. See supra Section III.B. This court also finds that, even if the aforementioned tampering did occur, it did not rise to the level of an "adverse employment action" sufficient to support a retaliation claim. Finally, this court finds that Plaintiff's arguments as to temporal proximity are not sufficiently persuasive, on their own, to survive the present motion.

### (a)  Facts

Plaintiff did have concerns, and perhaps valid concerns, about the actions Smith might have undertaken as HR Management Coordinator. Plaintiff testified in her deposition that, in that capacity, Smith "would be organizing schedules, assigning classes, you know, handing out duties as it relates to, you know, curriculum, etc." (Mann Dep. (Doc. 75-1) at 157.) Plaintiff testified that Smith did "assign . . . classes . . . to [Plaintiff] during her time as HR coordinator." (Id.) Plaintiff testified that she had "objections to the classes that Dr. Smith assigned to [her]" (id. 157-58) and that she brought

- 37 -

those concerns to "Moula Cherikh and Suresh Gopalan." (Id. at 158.)

However, beyond the fact that Plaintiff had objections to the classes she was assigned, Plaintiff offers no further detail as to what those objections might have been or why she objected to the class schedule for the Spring and Fall 2014 semesters.

The only evidence in the record to support Plaintiff's assertion that Smith abused control over Plaintiff's class schedule is found in Plaintiff's deposition when she alleges that Smith had "control over certain classes that [Plaintiff was] teaching and days that [Plaintiff was] teaching." (Mann Dep. (Doc. 75-1) at 267.) Plaintiff's conclusory assertion that Smith controlled the schedule is belied by the factual record. As noted earlier in this Memorandum Opinion, see supra Section III.B., Smith did not have any actual control over Plaintiff's schedule for the Spring 2014 semester, as her requested changes were rejected. (See Doc. 94-3.) Neither party has presented clear evidence as to who controlled the schedule for Fall 2014. Notwithstanding Plaintiff's own testimony, this court finds that the evidence in the record does not support a finding that Dr. Smith personally maintained agency over Plaintiff's course scheduling, through which Dr. Smith would be able to freely manipulate course scheduling in retaliation for Plaintiff's

- 38 -

protected activity. This court also finds that Plaintiff has presented no evidence of any change (or any negative effect as the result of a change) in Plaintiff's schedule for Fall 2014.

### (b) <u>Adverse Employment Action</u>

Even assuming Smith had some agency over Plaintiff's class schedule and that Plaintiff found the schedule objectionable, this court finds that Plaintiff's Spring 2014 and Fall 2014 class schedules do not constitute "adverse employment action."

A change in schedule or alteration of a schedule may constitute adverse employment action even if it does not affect salaries or duties. <u>See, e.g.</u>, <u>Washington v. Ill. Dep't of Revenue</u>, 420 F.3d 658, 662 (7th Cir. 2005) (altering plaintiff's schedule exploited a vulnerability of the plaintiff, as flex-time schedule allowed her to care for her son). As the Second Circuit persuasively described in finding that a schedule change was a punitive adverse employment action, "'an act that would be immaterial in some situations is material in others. For example, '[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.' And of course context can diminish as well as enlarge material effect." <u>Hicks</u>, 593 F.3d at 165 (quoting <u>Burlington N.</u>, 548 U.S. at 69).

A plaintiff "must allege more than a dislike for her new assignments or a preference for her old ones" in order for a court to find a retaliatory injury. Vance v. Ball State Univ., 646 F.3d 461, 474 (7th Cir. 2011). An assertion that a shift change or schedule change is undesirable or inconvenient "does not rise to the level of harm sufficiently serious to dissuade a reasonable worker from making or supporting a charge of discrimination." Thomas v. Potter, 202 F. App'x 118, 119 (7th Cir. 2006) (quoting Burlington N., 548 U.S. at 57 (internal quotation marks omitted)).

Plaintiff never alleges, in any detail, the actual changes to her schedule nor does she allege any specific hardship. Plaintiff testified that she "was not given the days that I had wanted to be given" and also had "an additional new prep that I had never done before that was, you know, a year before I'm coming up for tenure and should be doing research. . . . [I]t's almost like, you know, again, I'm being put in a really adverse position where I can't do what I need. It's publish or p[e]rish . . . " (Mann Dep. (Doc. 75-1) at 267-68.) Plaintiff provided this testimony in 2016, and beyond her stated apprehension about the schedule generally, Plaintiff otherwise describes no specific difficulties with the schedule as altered, whatever that change may have been. Notably, "[o]n August 18, 2014, [Dr.

- 40 -

Allen] notified [Plaintiff] by letter that [Plaintiff] would be reappointed to a three-year fixed term appointment as Assistant Professor of Management and Marketing beginning August 2014 and ending May 2017." (Allen Aff. (Doc. 95-8) ¶ 37.) The appointment suggests Plaintiff's concerns over the affect her schedule change would have on her ability to obtain re-appointment were unfounded. This court finds that Plaintiff has not presented evidence of a significant adverse effect of the schedule change beyond her initial apprehension.

Plaintiff's apprehension about her changed schedule constitutes the "minor annoyances that often take place at work and that all employees experience." Burlington N., 548 U.S. at 68; see Walker v. Glaxosmithkline (GSK), Case No. RWT 15-cv-2036, 2016 WL 4265341, at *5 (D. Md. Aug. 12, 2016); Johnson v. United Parcel Serv., Inc., Civil Action No. RDB-14-4003, 2016 WL 4240072, at *5 (D. Md. Aug. 11, 2016), aff'd, No. 16-2045, 2017 WL 715834 (4th Cir. Feb. 23, 2017); Cherry v. Elizabeth City State Univ., 147 F. Supp. 3d 414, 426 (E.D.N.C. 2015) (citing Holland, 487 F.3d at 219 ("The mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action.")); see also Martin v. Merck & Co., 446 F. Supp. 2d 615, 637 (W.D. Va. 2006). As such,

this court finds that any altering of Plaintiff's schedule does not constitute "adverse employment action."

### (c)  <u>Causation - Temporal Proximity</u>

Plaintiff cites an August 20, 2013 email for the proposition that "Dr. Smith's decision to change Plaintiff's teaching schedule came in the spring of 2014, after Dr. Smith learned of the completion of the November 2013 . . . investigation." (Pl.'s Sub. Resp. (Doc. 97) at 20 (citing Doc. 77 at 30-31; Doc. 78 at 490-94, 498-99).) Plaintiff also cites November 2013 correspondence between Mann, Smith and Allen summarizing the results of the investigation. (<u>Id.</u> (citing (Doc. 78) at 490-94, 498-99).)

While these letters do show that Smith became aware of the results of the internal investigation during November 2013, they do not provide any evidence of "Smith's decision to change Plaintiff's teaching schedule." (Pl.'s Sub. Resp. (Doc. 97) at 20.) This court finds that the time period of November, 2013, to sometime in the spring of 2014 (the date of a schedule change for Fall 2014 according to Plaintiff) "is too long to establish a causal connection by temporal proximity alone." <u>Pascual</u>, 193 F. App'x at 233 (finding three to four months separating the protected activity and firing was too long for temporal proximity). And although Plaintiff testified that the fall 2014

- 42 -

schedule was created in the spring of 2014, (Mann Dep. (Doc.
75-1) at 267-69), there is no evidence as to what that change
was or of any hardship created. By the spring of 2014, Dr.
Cherikh discontinued the role of area coordinators, thereby
removing Smith from any control of Plaintiff's schedule.
(Cherikh Aff. (Doc. 95-9) ¶ 13.) Plaintiff has not presented any
evidence of a material, adverse effect of her Fall 2014
schedule.

Although Plaintiff may have genuinely had significant
concern over the possibilities if Smith controlled her schedule,
the evidence is insufficient to demonstrate a material adverse
employment action sufficient to support a claim of retaliation
by WSSU.

### 4. Cancellation[4] of the Human Resources Program

This court finds that WSSU putting the Human Resources
major "on hold" did not constitute "adverse employment action"
given the surrounding circumstances. This court finds that
Plaintiff's arguments as to temporal proximity are not

---

[4] The record seems clear that the HR concentration was put
on some type of suspension of indefinite duration. Plaintiff
uses the term "cancelled" and Defendant uses the term "on hold."
Nevertheless, in this opinion, this court uses the terms "placed
on hold" and "cancellation" interchangeably, both to refer to a
suspension of indefinite duration.

sufficiently persuasive, on their own, to survive the present motion.

### (a)  Facts

Plaintiff states that in June 2014, she "learned that [her] HR Concentration and Department was cancelled for the Fall and presumably the future. . . . [Plaintiff] made it clear that [Plaintiff] was unhappy that [her] program was being eliminated through no fault of [her] own and due to disagreements with Dr. Smith arising out of [Smith's] discriminatory actions toward [Plaintiff]." (Pl.'s Aff. (Doc. 73-9 ¶ 52.) Plaintiff contends this cancellation of the HR concentration constitutes retaliation for her filing of discrimination complaints.

According to WSSU, "the University decided to place the HR program on hold because of low enrollment, a change in the University's strategic decision that placed a greater emphasis on liberal arts education, and the need to optimize faculty resources." (WSSU's Sub. Mem. (Doc. 98) at 27 (citations omitted).) In addition to a perceived "lack of collegiality" between Plaintiff and Smith, Gopalan said that the HR courses suffered from "single digit[]" enrollment and that the University wanted to focus more on "liberal art education." (Affidavit of Suresh Gopalan ("Gopalan Aff.") (Doc. 95-7) ¶¶ 11-12.) Cherikh also said that "the Human Resources

- 44 -

concentration within the Management major was being put on hold due to low enrollment . . . [and] very poor collaboration and collegiality between the main two faculty members in that field (Drs. Smith and Mann)." (Cherikh Aff. (Doc. 95-9) ¶ 20 (internal citations omitted).) Allen said that "[e]nrollment in HR courses had plummeted and the Department needed to find a way to better optimize and utilize existing resources." (Allen Aff. (Doc. 95-8) ¶ 34 (internal citations omitted).) Allen also said that "the decision . . . was not made lightly . . . [and] was not made as a retaliatory measure against Dr. Mann." (Id. ¶ 35.)

### (b)  **Adverse Employment Action**

Even assuming there are issues of fact as to the reasons for cancellation of the HR program, the cancellation does not constitute an adverse employment action. Plaintiff alleges that, as a result of the cancellation, "she would now have to read and research in an all new area." (Pl.'s Sub. (Doc. 97) at 18 (quoting Mann Dep. (Doc. 75-1) at 226-27) (internal quotation marks omitted).)

As a preliminary matter, given Plaintiff's position as a "management professor," even one with a concentration and preference in HR, this court is not able to find from the evidence that Plaintiff had any reasonable expectation that she would teach only HR courses as opposed to other general

- 45 -

management courses such that placing the HR program on hold was adverse to Plaintiff. Plaintiff argues that she "was now forced to prepare an all new curriculum, do curriculum research on a different topic area with little time to complete the research necessary to achieve tenure status." (Id.) However, while this may be a disputed issue of fact as to the burden imposed by the reassignment, the record as a whole does not support a finding that this constitutes a significant detrimental effect nor even an unreasonable employment action as to Plaintiff.

The record indicates, and it appears undisputed, that Plaintiff "was capable and qualified to teach other topics . . . . Dr. Mann was hired as an Assistant Professor of Management, not as an Assistant Professor of Human Resources. Her graduate training was in Management and Organizational Behavior." (Cherikh Aff. (Doc. 95-9) ¶ 21.) Further, "[a]s a management professor, Dr. Mann was eligible and qualified to teach several other management courses including the basic HR courses that were not being taken off the table (including the graduate MBA HR course)." (Gopalan Aff. (Doc. 95-7) ¶ 14.) Cherikh said that Mann "would have been a valuable and an effective instructor for the majority of courses comprising the general Management major." (Cherikh Aff. (Doc. 95-9) ¶ 21.) Gopalan "did not see this as a negative for [Mann's] career in

WSSU." (Gopalan Aff. (Doc. 95-7) ¶ 14.) Plaintiff does not dispute this evidence.

A district court within the Fourth Circuit has persuasively held that a teaching assistant who was "assigned janitorial duties; and . . . could not attend assemblies due to her workload" had not sufficiently shown an "adverse employment action." Thomas v. Cumberland Cty. Bd. of Educ., No. 5:10-CV-552-FL, 2013 WL 5348439, at *5 (E.D.N.C. Sept. 23, 2013), aff'd, 558 F. App'x 311 (4th Cir. 2014). Another district court within the Fourth Circuit, in holding that a teacher whose school system transferred her to a different school had not satisfied the appropriate standard, observed that "overwhelming authority continues to hold that transfers like the one at issue are not adverse action. Under Burlington Northern's objective inquiry, district courts in this circuit have held again and again that involuntary transfers have not constituted adverse action under the retaliation provision." Holleman v. Colonial Heights Sch. Bd., 854 F. Supp. 2d 344, 355 (E.D. Va. 2012) (citing Sturdivant v. Geren, Civil Action No. 1:09-cv-586, 2009 WL 4030738, at *7 (E.D. Va. Nov. 19, 2009)).

In August of 2014, Plaintiff was reappointed "to a three-year fixed term appointment as Assistant Professor of Management and Marketing beginning August 2014 and ending May 2017, (Allen

- 47 -

Aff. (Doc. 95-8) ¶ 37), suggesting any additional work caused by the HR cancellation was not sufficient to interfere with her continued employment by Defendant. This court finds that the change in assignment, while perhaps creating some short-term difficulty and trepidation, was not so burdensome to rise to the level of a retaliatory act. Plaintiff has presented no evidence that cancellation of the HR concentration caused Plaintiff any decrease in job title, level of responsibility or opportunity for promotion, nor does it appear to create an injury or harm sufficient to dissuade a worker from making or supporting a claim of discrimination. See Burlington N., 548 U.S. at 68; Rigg v. Urana, 113 F. Supp. 3d 825, 829 (M.D.N.C. 2015). The record shows that, while Plaintiff might have preferred to teach HR classes, the HR program being put "on hold" constitutes a "minor annoyance[] that often take place[s] at work and that all employees experience," Burlington N., 548 U.S. at 68. Plaintiff was qualified to teach other classes, albeit potentially requiring added time to prepare. Plaintiff's subjective preference for participating in a curriculum that included an HR concentration does not make cancellation of the HR concentration a materially adverse action. Burlington Northern requires review under an objective standard; material adversity "depends upon the circumstances of the particular case," id. at 71, and

- 48 -

Plaintiff has only presented evidence of her subjective dislike of the cancellation. As such, it does not constitute "adverse employment action."

### (c) But-For Test and Cancellation of HR

Even assuming Allen, Gopalan, and WSSU were aware of the May 2014 EEOC complaint and cancellation of HR could constitute adverse employment action as to Plaintiff, the record is clear that the HR concentration cancellation was under consideration for a lengthy period of time, both before, (Doc. 78 at 504), and after, (Doc 92-17 at 1), Plaintiff filed the EEOC complaint. The challenged action affected both Smith and Plaintiff similarly. Plaintiff does not dispute the stated reasons for placing the HR concentration on hold, including low enrollment and a focus on liberal arts. (See Gopalan Aff. (Doc. 95-7) ¶¶ 11-12; Cherikh Aff. (Doc. 95-9) ¶ 20 (internal citations omitted); Allen Aff. (Doc. 95-8) ¶ 34 (internal citations omitted).)

This court finds that WSSU has "articulate[d] a legitimate, non-retaliatory reason for the adverse employment action." Navy Fed. Credit Union, 424 F.3d at 407 (citing Reeves, 530 U.S. at 143; Laughlin, 149 F.3d at 258). The legitimate, non-retaliatory reason for the adverse employment action, specifically, low enrollment, demonstrates that Plaintiff's evidence fails to

- 49 -

establish that any unlawful retaliation from placing the HR concentration on hold "would not have occurred in the absence of the alleged wrongful action or actions of the employer." Everhart, 660 F. App'x at 230. The Supreme Court rejected a "motivating factor" test for retaliation in University of Texas Southwestern Medical Center v. Nassar, ____ U.S. ____, 133 S. Ct. 2517 (2013), and held that proof of retaliation requires proof of but-for causation. In light of that standard, Plaintiff's evidence fails to demonstrate that the HR concentration action constitutes retaliation.

### 5. **Denial of Pay Raise**

This court finds that Dean Corey Walker, the individual responsible for recommending candidates for the pay raise in question, did not have knowledge of Plaintiff's protected activity. Further, this court finds that WSSU has provided a legitimate, non-retaliatory reason that Plaintiff did not receive the pay raise.

### (a) **Facts**

Plaintiff states that in October 2014 she learned that a salary adjustment was available, and she sent in a document to Dr. Cherikh describing her qualifications for the pay raise. (Pl.'s Aff. (Doc. 73-9) ¶¶ 53-54.) Plaintiff believed she was well-qualified for the pay raise. (Id. ¶ 54.) Dr. Cherikh agreed

- 50 -

with Plaintiff's assessment and recommended her for the pay raise. (Id.) However, Plaintiff did not receive the recommended pay raise, (id. ¶ 55), and contends the failure to award the pay raise was in retaliation for her complaints.

Plaintiff's testimony as to the pay raise decision conflicts in certain material respects. Plaintiff states in her affidavit dated December 5, 2016, that the raises "were initially approved by Dr. Cory [sic] Walker and that final signatory authority for the raises resided with Brenda Allen as she told me and all of my colleagues this [] in a meeting when she announced the raises." (Id. ¶ 55.) However, Plaintiff testified during her deposition in August, 2016, that she had not talked to Dean Walker about her raise, and she could not recall speaking to Dr. Allen about her raise. (Mann. Dep. (Doc. 75-1) at 181.) Plaintiff acknowledged that she did not have any knowledge of what Dean Walker sent to Dr. Allen in regard to the pay raises. (Id. at 183-84.)

This court, after review of the record, can find no evidence to support a finding that Dean Walker approved Plaintiff's pay raise as Plaintiff's affidavit might be read to suggest. An affidavit is required to contain facts "made on personal knowledge" that are "admissible in evidence." Fed. R. Civ. P. 56(c)(4). To the extent Plaintiff's affidavit may be

- 51 -

read to suggest Dean Walker approved a pay raise for her specifically, Plaintiff offers no basis for that assertion. To the contrary, the record appears undisputed that Dean Walker did not recommend Plaintiff for a pay raise.

Dean Walker's affidavit states that Dr. Cherikh recommended Plaintiff for a merit adjustment. (Affidavit of Corey Walker ("Walker Aff.") (Doc. 95-6) ¶ 15.) Dean Walker believed Plaintiff did not meet the criteria for an adjustment because Dr. Cherikh's recommendation of Plaintiff "did not demonstrate significant contributions to our strategic priorities . . . ." (Id. ¶ 21 (internal quotation marks omitted).) This court finds Plaintiff's unsupported allegation that Dean Walker "approved the pay raises" is not supported by a competent foundation, as Plaintiff never spoke with Dean Walker or Dr. Allen about the pay raise, nor has Plaintiff presented any evidence to contradict Dean Walker's affidavit. This court finds that Dr. Cherikh recommended Plaintiff for a pay raise, but Dean Walker did not recommend Plaintiff to Dr. Allen for a raise. Because Dean Walker states unequivocally that Dr. Cherikh's recommendation was not binding, (see id.), and Allen appears to have only passed on a raise for those individuals recommended by Dean Walker. (Allen Aff. (Doc. 95-8) ¶ 41 ("I then further prioritized the list based upon recommendations received across

- 52 -

academic units and submitted the recommendations to the
Chancellor.").) This court finds Dean Walker was the relevant
decisionmaker for purposes of Plaintiff's requested pay
increase.

### (b) Causation – Actual Knowledge

The record indicates that Walker made the decision not to
give Plaintiff a merit adjustment and then recommended that to
Allen. (Walker Aff. (Doc. 95-6) ¶ 21; Allen Aff. (Doc. 95-8)
¶¶ 40-42.) Walker stated that "[a]t the time [he] was reviewing
the submissions and recommendations . . . , [he] had no
knowledge that Plaintiff had filed complaints against Drs. Smith
and Khojasteh with the University's EEO Officer and a civil
rights complaint against the University." (Walker Aff. (Doc.
95-6) ¶ 18.)

In her supplemental briefing, Plaintiff disputes this fact
and contends that she has "proffered specific facts indicating
that Dean Walker knew about [Plaintiff's] claim of retaliation
at the time he denied her raise." (Doc. 123 at 2.) However,
Plaintiff's citation for that proposition, Document No. 75-1 at
288 (see id.), does not support this argument. The citation is
to Plaintiff's deposition testimony; that testimony at page 288
does not relate to the merit pay raise, but instead relates to
cancellation of the HR program. (See id.) Plaintiff does discuss

- 53 -

the pay raise and relevant actors in her deposition, (see id. at 177-87), but this court's review of the record fails to reveal any evidence to contradict Dean Walker's affidavit that he was not aware of Plaintiff's complaints. As a result, contrary to Plaintiff's argument, this court finds Dean Walker was not aware of Plaintiff's complaints.

Allen stated that "Dr. Mann did not appear on the list of recommendations I received from Dean Walker and therefore I did not consider her as part of my deliberations.[.] At the time I forwarded the recommendations to the Chancellor, I was unaware that Dr. Cherikh had recommended Dr. Mann for a merit increase." (Allen Aff. (Doc. 95-8) ¶ 42.) This court finds that Walker was responsible for the decision not to give Plaintiff a merit raise and that Defendant has established that Walker did not "ha[ve] knowledge of the protected activity in order for its subsequent adverse employment actions to be retaliatory." Shields, 120 F. App'x at 962. "[T]he employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998). Plaintiff has not presented evidence from which a jury could conclude the failure to award a pay raise was retaliatory.

### (c)  <u>Legitimate, Non-Retaliatory Reasons</u>

Plaintiff argues that "a jury could find the pay raise denial was not because Plaintiff failed to meet some subjective nebulous standard, but was instead because she had filed an EEOC complaint." (Pl.'s Sub. Resp. (Doc. 97) at 24.) WSSU argues "Plaintiff was not awarded a merit pay increase in 2014 because she did not meet the necessary criteria." (WSSU's Sub. Mem. (Doc. 98) at 28.) The record shows that, while Cherikh recommended Plaintiff for a pay raise, Walker believed Plaintiff lacked "significant contributions in . . . innovations in teaching designed to enhance student success, course redesign efforts consistent with institutional aims and goal, curricular reform efforts, or interdisciplinary teaching efforts. Similarly, she had not made significant contributions in the area of Undergraduate Research or University Service." (Walker Aff. (Doc. 95-6) ¶ 21.) Further, the record shows that "only about 44 of over 300 faculty members received raises due to limited resources." (<u>Id.</u> ¶ 20; Allen Aff. (Doc. 95-8) ¶ 41.)

This court finds that WSSU has "articulate[d] a legitimate, non-retaliatory reason for the adverse employment action" — Plaintiff did not meet the criteria required for the raise and very few members of the faculty received raises. <u>Navy Fed. Credit Union</u>, 424 F.3d at 407. This court also finds that

Plaintiff has not shown that WSSU's "stated reasons for taking the employment action were not its true reasons, but rather 'pretext' for unlawful discrimination." Moore, 305 F. App'x at 114-15 (citing Hill, 354 F.3d at 285). Therefore, this court will find that the denial of a pay raise to Plaintiff was not alone a retaliatory action.

### 6. Aggregate Consideration

The Writing Center incident is not contextually related to the other two alleged adverse employment actions for purposes of Plaintiff's retaliation claim as the relevant actors were removed from the departmental affairs generally. It is not disputed that the Writing Center resources were insufficient to accommodate all the students at one time, and the matter was resolved favorably with no lingering issues. (See, e.g., Simmons Aff. (Doc. 95-5) ¶ 15.) As to both the Writing Center incident and the pay raise issue, there is no causal connection between the complaints of discrimination and the employment action as the relevant actors and decisionmakers acted without knowledge of Plaintiff's protected activity. See Dowe, 145 F.3d at 657 ("[T]he employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary . . . . Here, it is undisputed that . . . the relevant decisionmaker [] was unaware Dowe had ever filed a complaint with the EEOC.") Nevertheless,

- 56 -

this court has considered the constellation of actions - the alleged scheduling change and cancellation of the Human Resources concentration – and whether collectively they constitute a "significant detrimental effect on [Plaintiff's] employment" posed by their aggregation. Lewis v. City of Va. Beach, Action No. 2:15cv321, 2016 WL 4766515, at *8 (E.D. Va. Sept. 12, 2016); Westmoreland v. Prince George's Cty., Md., 876 F. Supp. 2d 594, 605 (D. Md. 2012). Even considering the two actions collectively, this court is unable to find these actions were materially adverse employment actions for purposes of retaliation. Other than subjective disagreement or dislike, Plaintiff has not presented evidence of objective material adversity, at least based on the evidence presented. "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm . . . . [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse . . . ." Burlington N., 548 U.S. at 67. The Supreme Court speaks "of material adversity because [the Court] believe[s] it is important to separate significant from trivial harms. Title VII . . . does not set forth 'a general civility code for the American workplace.'" Id. at 68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). While

- 57 -

Defendant's changes to Plaintiff's schedule and curriculum may have generated subjective dislike from Plaintiff, those actions did not impose any objective adversity, such as a demotion, a pay cut, removal of responsibilities, or unfair embarrassment, harassment or ridicule.

Defendant's management of the Department during Plaintiff's tenure certainly appears to have been problematic. Issues arising from Dr. Smith's alleged conduct and Defendant's apparent inability to fully address that conduct formed a basis upon which Plaintiff might reasonably perceive employment decisions as inappropriate, even if those decisions were reasonable departmental decisions. However, even if Plaintiff's perceptions were reasonable, Plaintiff's complaints do not insulate Plaintiff from less-than-perfect working conditions. This court is unable to find that Defendant's actions constitute retaliation under Title VII. For the reasons discussed above in each of the relevant sections this court finds that, even considered in the aggregate, the employment actions complained of by Plaintiff do not rise to the level of an adverse employment action.

IV. **CONCLUSION**

For the reasons discussed above, **IT IS HEREBY ORDERED** that Winston-Salem State University's Motion and Substitute Motion

for Summary Judgment (Docs. 59, 91) are **GRANTED** and that this case is **DISMISSED**.

A judgment in accordance with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 21st day of July, 2017.

_____
United States District Judge